CITY OF MILWAUKEE, Respondent, v. BUB, Appellant.

*October 31—November 27, 1962.*

For the appellant there was a brief by *Jeknavorian, Ludwig & Shlimovitz* of Milwaukee, and oral argument by *R. Arthur Ludwig.*

For the respondent there was a brief by *John J. Fleming,* city attorney, and *Theophilus C. Crockett* and *Patrick J. Madden,* assistant city attorneys, and oral argument by *Mr. Crockett* and *Mr. Madden.*

DIETERICH, J. For the purposes of this opinion we will refer to the defendant-appellant Kenneth Bub, as "Bub," and the complainant-respondent city of Milwaukee, as "city."

The instant action was commenced by a warrant of arrest issued by the district court of Milwaukee county on a complaint of a city police officer made under oath upon information and belief that Bub on April 29, 1961, in the city of Milwaukee, did violate sec. 101–7 of an ordinance of the city of Milwaukee entitled "Driving, Meeting, Overtaking and Passing—Vehicles to be driven on right side of roadway; . . . (1) Upon all roadways of sufficient width the operator of a vehicle shall drive on the right half of the roadway . . . ." The ordinance was adopted pursuant to the provisions contained in secs. 346.05 (1), 349.03, and 349.06, Stats.[1]

---

[1] Sec. 346.05. "VEHICLES TO BE DRIVEN ON RIGHT SIDE OF ROADWAY; EXCEPTIONS. (1) Upon all roadways of sufficient width the operator of a vehicle shall drive on the right half of the roadway . . ."

The complaint alleges that Bub did fail to operate his vehicle upon the right half of the roadway on North Twenty-Seventh street, all contrary to the provisions of said ordinance.

The district court on trial found Bub guilty and sentenced him to pay a penalty of $50 and costs or in default thereof to be imprisoned in the house of correction in Milwaukee county not to exceed thirty days. Bub then appealed from the judgment of the district court to the municipal court of Milwaukee county. A trial *de novo* was had to the court without a jury. The municipal court found Bub guilty of the offense as charged and sentenced him to pay a fine of $25 and costs or thirty days in the house of correction. The appeal in the instant action is from the judgment of the municipal court.

The violation of a city ordinance is defined by the statute as a civil proceeding.[2] The violation of a traffic ordinance however is not a mine-run ordinance violation because it involves more than a money penalty. The defendant also stands to lose, if convicted, the valuable privilege of driving on our streets and highways.[3]

---

Sec. 349.03. "REGULATION BY LOCAL AUTHORITIES FORBIDDEN; EXCEPTIONS. (1) Chapters 341 to 348 shall be uniform in operation throughout the state. No local authority may enact or enforce any traffic regulation unless such regulation:

"(a) Is not contrary to or inconsistent with chs. 341 to 348; or

"(b) Is expressly authorized by secs. 349.06 to 349.25 or some other provision of the statutes."

Sec. 349.06. "AUTHORITY TO ADOPT TRAFFIC REGULATIONS IN STRICT CONFORMITY WITH STATE LAW. Except for the suspension or revocation of motor vehicle operator's licenses, any local authority may enact and enforce any traffic regulation which is in strict conformity with chs. 341 to 348 but the penalty for violation of any of its provisions shall be limited to a forfeiture."

[2] Sec. 66.12. "ACTIONS FOR VIOLATION OF CITY OR VILLAGE REGULATIONS. (1) . . . (a) An action for violation of a city or village ordinance, . . . is a civil proceeding."

[3] Sec. 343.32. "OTHER GROUNDS FOR REVOCATION OF LICENSES.

° ° •

At the trial before the municipal court the city called a police officer to testify. When the city asked the officer whether he could determine where the impact which gave rise to this action occurred, counsel for defendant Bub objected. The court overruled the objection and the officer subsequently testified as to the point of impact between the vehicles, though he had not been present when the collision occurred. To determine whether the court erred when it overruled defendant's objection, and to determine whether, if error existed, such error was prejudicial, it is necessary to review the evidence.

The record discloses that Bub made a stop at the stop sign at the intersection of North Twenty-Seventh street and

"(2) The commissioner may revoke a person's operating privilege if such person appears by the records of the department to be an habitually reckless or negligent operator of a motor vehicle or to have repeatedly violated any of the state traffic laws or any local ordinance which is in conformity therewith. For the purpose of determining when to revoke an operating privilege under this subsection, the commissioner may determine and adopt by rule a method of weighing traffic convictions by their seriousness and may change such weighted scale from time to time as experience or the accident frequency in the state makes necessary or desirable. In regard to *convictions which are not by themselves grounds for mandatory revocation of a license, such rule shall provide that demerit points accumulated* when a person is not operating a vehicle as a chauffeur shall not be counted against his chauffeur's license but such rule may provide that demerit points accumulated by a person when operating a vehicle as a chauffeur shall be counted against his regular license. When a person who has had his regular license revoked continues to operate as a private operator and who also has a chauffeur's license and is convicted of any traffic violation, 12 demerit points shall be assigned against his chauffeur's license." (Italics supplied.)

5 Wis. Adm. Code, sec. MVD 11.01 "CAUSES FOR MANDATORY REVOCATION OF OPERATOR'S LICENSE. (1) Whenever any person is convicted of any one of the offenses enumerated under section 343.31 (a) through (f), Wis. Stats., there shall be charged against his driving record 12 points."

West Atkinson avenue and then proceeded to make a right-hand turn onto North Twenty-Seventh street. North Twenty-Seventh street is a four-lane highway. The testimony reveals that a collision took place on April 29, 1961, at approximately 1:55 a. m., between the automobile driven by Bub and the automobile driven by Robert Carroll (who hereinafter will be referred to as "Carroll"). Carroll testified as follows:

"*Q.* Were you involved in an accident with the said defendant [Bub]? *A.* Yes. . . .

"*Q.* Would you kindly tell the court how the accident happened? *A.* I was going north on Twenty-Seventh and I was coming to my stop sign and this car made a wide turn coming off of Atkinson at Twenty-Seventh and came in to me.

"*Q.* Now is there a center line for traffic on North Twenty-Seventh street? *A.* Yes, there is. . . . It is a line, it is white.

"*Q.* Now are there lanes, are there marked lanes for traffic going in a northerly direction on north Twenty-Seventh street at that point? *A.* Yes.

"*Q.* How many lanes of travel can move north on the east side of the center line? *A.* Two.

"*Q.* Using the lane, the center line as lane number one and the lane next to the curb as lane number two, in which lane were you two at the time your automobile was struck? . . . The lane near the center line? . . . How far away from the center line was your automobile at the time of the collision? *A.* It was right by the center line.

"*Q.* Can you estimate the distance that the left side of your car was from the center line? *A.* My wheels were inside the center line. My left front wheels were inside the center line."

Court: "How much inside, do you know? *A.* I was just confident I was inside the lane."

Counsel for city: "*Q.* Now at the time of the impact, was your automobile moving or was it standing still? *A.* I would say I realize he was going to hit me and I came to a stop just like that. He hit me and went on about 50 yards.

"*Q.* What part of your automobile was struck? *A.* The left front fender and headlight and radiator. . . .

"*Q.* Did you talk to him at that time? *A.* Yes.

"*Q.* Did you discuss this accident? *A.* Well, the police officer was asking questions, I was right there with him. We were conversing about the accident. . . .

"*Q.* Did he tell you what he thought had happened? *A.* Yes, he said I was in his lane.

"*Q.* Did you deny that at that time? *A.* Yes."

Cross-examination of Carroll.

"*Q.* Where was your car immediately after the accident with relation to this center line? *A.* Right on—right by the center line."

The city then called Patrolman Gordon Watters of the Milwaukee police department. His testimony is as follows:

"*Q.* Did you investigate an accident that happened at the intersection of North Twenty-Seventh street and West Atkinson at or about 1:55 a. m., on April 29, 1961? *A.* Just south of the intersection I did, sir.

"*Q.* Now the accident in question involved an automobile being driven by the defendant [Bub] is that correct? *A.* Yes, it is.

"*Q.* And an automobile being driven by Mr. Carroll, the witness who just preceded you, is that right? *A.* That is true.

"*Q.* Now did you survey the point of impact between the two automobiles? *A.* I did.

"*Q.* Were you able to determine from your investigation where, with respect to the center line of North Twenty-Seventh street, the impact occurred?"

Counsel for Bub: "I am going to object to that, Your Honor."

Court: "On what ground?"

Counsel for Bub: "No foundation to this. I believe this witness did not witness the accident and in order for any witness to testify as to the exact location, the point of impact, it would require expert testimony. Make measurements, take the width of the automobiles, ascertain where

they were located after the accident, to come up with the proper answer."

Court: "The objection is overruled. There are decisions by the Wisconsin supreme court right in point."

"*A*. You want me to answer?"

Counsel for city: "*Q*. Yes. *A*. My investigation revealed that vehicle number two, driven by Mr. Carroll, the wheels were on the left side—the wheels on the left side of the automobile were approximately one and one-half to two feet to the east of the center line of North Twenty-Seventh street. . . .

"*Q*. At the time you arrived on the scene, where was Mr. Carroll's Mercury? *A*. Mr. Carroll's Mercury was situated at what I determined as the point of impact within a few feet facing north on North Twenty-Seventh street approximately 25 foot from the crosswalk of the intersection of North Twenty-Seventh street and West Atkinson avenue. . . ."

Cross-examination of Patrolman Watters.

"*Q*. You did observe that there was debris in the area? *A*. I did.

"*Q*. Did you make an observation as to the location of the debris? *A*. I did.

"*Q*. Where in general was the debris? *A*. The debris in regard to Mr. Carroll's automobile which was parked at the scene was to the front, underneath, to the left of his auto in both lanes of traffic. Northbound and southbound. . . .

"*Q*. Where was Mr. Bub's car when you came to the scene of the accident? *A*. When I arrived at the scene Mr. Bub's car was parked approximately 150 feet south of the point of impact on North Twenty-Seventh street. . . ."

Court: "Officer, how long have you been an officer? *A*. It will be six years this winter."

Court: "How many accidents have you investigated during that time? *A*. Approximately 300, maybe more."

Court: "Over 300, have you testified in other courts in this community regarding the said location of accidents? *A*. I have, Your Honor. . . ."

Kenneth Bub testified as follows:

"*Q.* Do you recall the accident you were involved in on that evening? *A.* Yes.

"*Q.* Can you tell what general direction you had come from just prior to the accident? *A.* I was heading south on Atkinson. East I believe you would call it. I stopped for the stop sign and then was heading due south on Twenty-Seventh.

"*Q.* The Atkinson avenue and Twenty-Seventh street intersection is not at right angles, is that correct? *A.* No, it isn't.

"*Q.* What did you do after you made this stop? *A.* I made a right-hand turn and proceeded then into the left lane on my side of the road.

"*Q.* Where, in relation to the intersection, did this accident happen? *A.* Well, from where I turned or from the corner on an angle there, it was from my corner, it was about 150 feet—200 feet. . . .

"*Q.* What type of damage was done to your automobile? *A.* Left front fender, bumper, and grill. . . .

"*Q.* What happened to you and your car immediately after this accident? *A.* I was thrown to the right and I couldn't straighten out. I coasted over to the curb. I turned my wheel to the left to straighten out the car because the bumper had come back and I couldn't straighten it out. I have to have the car towed away. . . .

"*Q.* Did you have an opportunity at that time to view the scene of the accident? *A.* Yes.

"*Q.* Did you notice any debris around there? . . . *A.* Mostly on my side of the line. The dirt and that was on my side. There was glass and chrome and pieces of metal around there on both sides.

"*Q.* Did you have an opportunity to see the car of Mr. Carroll? *A.* Yes.

"*Q.* Do you recall where that was located in relation to the center line? *A.* Just over the other side.

"*Q.* The pavement was dry? *A.* Yes.

"*Q.* Did you happen to notice any skid marks in this area? *A.* No, I didn't."

Cross-examination of Bub.

"*Q.* Your testimony is the dirt and debris was mostly on the other side of the center line? *A.* On my side of the center line.

"*Q.* Is it your testimony that Mr. Carroll's car was just over the other side? *A.* Yes. . . .

"*Q.* At the time that your car actually collided with the one driven by Mr. Carroll, it is possible your front wheels could have crossed the center line, isn't it? *A.* No, because I couldn't turn to the left or anything at all. I couldn't go to that side at all. I couldn't straighten my wheels out after the accident or anything. I went to the right by force."

On redirect examination, Bub clarified his testimony with respect to the position of Carroll's automobile before and after the accident. He stated that immediately after the accident Carroll's car was located about one fourth over the line and that just before the accident occurred he had seen Carroll in his lane.

The defendant contends that the trial court erred as a matter of law in receiving the testimony of the patrolman as an expert witness with respect to the point of collision between the two automobiles.

We do not consider it would be error to permit a qualified expert to state his opinion as to the position of the two units at the time of impact based upon such facts as damage to the vehicles, position of the units after the accident, and marks or absence of marks on the pavement and shoulders. *Henthorn v. M. G. C. Corp.* (1957), 1 Wis. (2d) 180, 190, 83 N. W. (2d) 759. It takes a high degree of training, plus experience, to become an expert on the complex problem of where an impact occurs in an automobile accident. The testimony of Police Officer Watters certainly does not qualify him as an expert witness. Although the record discloses that Watters is an experienced

police officer, that in itself does not qualify him as a physicist or engineer and without such knowledge his testimony can be given no weight as to the point of impact. It is apparent from the record that the trial court was considerably influenced by the testimony of Police Officer Watters. However, that testimony is incompetent as it pertains to the place of impact, and the trial court erred when it overruled defendant's objection to the admissibility of Watters' testimony relating to the point of impact.

The overruling of defendant's objection by the trial court constitutes prejudicial error and entitles the defendant Bub to a new trial.

*By the Court.*—Judgment reversed, and cause remanded for a new trial.

FAIRCHILD, J., dissents.